May it please the Court, Counsel. This Court should reverse the District Court's denial of Watts Guerra LLP's renewed motion for judgment as a matter of law for two reasons. One, the agent, Daniel Homolka, under the undisputed facts was acting in excess of his actual authority when the broken promises at issue in this case were made. And two, there is a failure of three separate essential elements, a failure of proof required for liability to attach based upon apparent or ostensible authority. Now, this case presents the question of when the principal, Watts Guerra LLP, one of my clients, can be liable for the contract made by its agent, Daniel Homolka. And with South Dakota law, all the cases and everyone agrees the law is this, that despite being in an agency relationship, the principal is only liable for that contract if it has been authorized. And there's two ways you get there. The plaintiff either has to show actual authority or all the requirements for apparent authority. And here, based upon the evidence that was developed at trial and based upon the undisputed and unrebutted testimony, there cannot be a satisfaction of either of those requirements. Thus, the agency issue never should have gone to the jury and the District Court should have granted the motion for judgment as a matter of law. Now, I want to start with the apparent authority issue because that's where the District Court made its mistake in ruling on the renewed motion. South Dakota has a statute that says, it's 59-6-3, quote, a principal is bound by acts of the agent under ostensible authority to those persons only who have in good faith and without negligence incurred a liability or parted with value upon the faith thereof. And here's what the South Dakota Supreme Court has told us that statute means, because that's the statute and the hook that they have to rely on to create the basis for liability under ostensible authority for the principal. The Supreme Court of South Dakota has told us. One thing, most of the cases seem to be affirmative acts. This is a failure to act. If you get an application of that statute where the plaintiff says, you didn't pay me and you should have, and the defense is, well, it was his fault. You know, the difference between affirmative misrepresentation and negligent omission. And I think I understand the question, Judge Loken, and I think the answer is, is you're not going to find that because the South Dakota Supreme Court has said, by the way, as has this Court applying South Dakota law in the American Construction case versus Hoitch, but the South Dakota Supreme Court in the Bordeaux versus Shannon County case, the Cass Elder case, has said there has to be an act of the principal. It can't be the acts of the agents or third parties that form the basis for the principal's liability. So what they want to, the plaintiff is trying to do here is bootstrap acts of third parties unrelated to the principal and say, you should have spoken, and because you didn't speak, as a consequence, you have effectively represented to us that the agent has the authority. And South Dakota law says you can't get there. There has to be an act that forms or a statement that takes them. Oh, wait a minute. If the plaintiff is sitting in a meeting with the agent and the principal, and the agent does all the talking, and then the agent doesn't do what the plaintiff wants and says, you owe me. Oh, no. I don't owe you. The principal owes you. Now the principal's, even the principal's silence in the meeting can be relevant to the plaintiff relying on the agent making a promise that the agent would perform on behalf of the principal. I would agree with you that it could be relevant, Judge Loken. Aesthetically, at least. But that's not this case. Well, it is kind of this case. I haven't studied the record like you have. Here's the fundamental difference between your hypothetical and this case. The fundamental difference is this. You said, based upon the assumption that the principal was there and knew about the deal that was made. And I would agree that if the principal is there and is aware of it, then that, along with other evidence, in some circumstances, may form a basis in which there's conduct of the principal to establish ostensible authority. But what we know here, and here's where the timeline really matters, Your Honor. The undisputed evidence in this case was that the deal, the oral promises that occurred that formed the basis of Mr. Lundstrom being engaged to provide the marketing services. The deal was made in December 15th of 2014 and December 22nd of 2014. There's two meetings. Those meetings occur in the Rasmus Hovland Law Firm in Edina, Minnesota. And here's the key, Your Honor. Nobody from Watts-Guerra was ever at those meetings. We have those meetings. And based upon those meetings, Mr. Lundstrom and his testimony and the undisputed evidence in the record was that he believed he had been hired to be paid $10,000 a month through the completion and the settlement of the Syngenta litigation or dismissal and had been promised a bonus. And then, even viewing the light most favorable of the verdict, you hear that by February of 2015, there's a phone call. That phone call is between Mr. Hovland, excuse me, Mr. Homolka, the agent, and Mr. Lundstrom. Watts-Guerra is not involved in that call. What happens at that call? Well, at that call, Mr. Lundstrom testifies, the amount of the bonus was set at $3.4 million. The only other communications, the offer and acceptance that formed the basis of the deal in this case was a promise based upon reimbursing for a pickup. And that occurred in early to mid-2015. And we know, Judge, the judges, that by November of 2015, that promise had been made and the jury found accepted because he bought the pickup. So, all of this time up through November of 2015, when the deal is made, there's no evidence that my clients, Watts-Guerra, were aware of the promises. And that's what's different than your scenario. Counsel, Judge Kovach here, I thought the statute also talks about warrants of ordinary care or something along those lines. And why doesn't that phrase mean that there was some duty on your client who knew that the plaintiff here was working on behalf of local counsel, who was, in fact, dealing or receiving budgets and, in fact, cut checks? Wouldn't ordinary care of a sophisticated law firm require some more action in that point? Under the facts here, Judge Kovach, I would submit no, because here's what the undisputed evidence is. The only checks that were submitted or paid from Watts-Guerra were pursuant to two approved budgets. The facts were undisputed in the underlying trial that before incurring any marketing expenses, Dan Homolka had to submit a budget to Watts-Guerra that had to be approved, that had to be submitted and done based on unrebutted and undisputed evidence because Watts-Guerra is relying on litigation funding sources. Now, we have two budgets, and this is important. There's a budget covering the time period from January to April of 2015. It's undisputed. It's cited throughout the briefs. The exhibits are in the record. You can look at them. There's also a second budget from May of 2015 through September of 2015. Those two budgets were approved. Those two budgets were for $10,000 a month during those periods, and those were the monies paid. So, from Watts-Guerra's perspective... And in the first... You're talking about the first budget period? There's... They're both in 2015. There's two budget periods, and he paid all of both of them. So, the first budget period is from January to April of 15, and then from May of September. And so, Judge Kovas, when you look at that, the only thing Watts-Guerra knew was that it was paying pursuant to its authorized approved budgets. So... So, just to be clear, the record shows that there were no payments made prior to receipt of the budget? There was a e-mail approving, and my recollection is that there may have been an advance or a payment made, but it was then subsumed as part of the first budget. And separate... So, is that a recognition by the parties that there was some arrangement that existed with definite enough terms? The parties... Prior to the existence of the budget? That the contract existed? The parties, meaning which parties, Judge Erickson, because I think it matters. I think it does. And I'm asking is Watts-Guerra, they're making the payments. They're making the payments according to some understanding, right? Because those in that, aren't they the ones making the disbursements? Yeah. And so, and don't they have some agreement, or are they just beyond the budget? Here's what they understand, and what the evidence was that was undisputed. They believe that if the expenses were incurred pursuant to the budget, and even before, they're building the first budget. Now, they who? They, meaning Watts-Guerra, my law, my client. Because what... It's whether they're creating a basis for Blundstrom to rely on. The promise was made by the agent on behalf of the agent and the principal. But to the extent you're relying on evidence of other payments to suggest they should have known, what they know matters. And what they know is it's all pursuant to the budget. Now, the reliance issue, Judge Loken, before I, because I'm using up my time, is really the biggest issue in this case. And fundamentally, here's why you don't even have to get to the affirmative statement. The end of the day, the law is clear in South Dakota, and I would direct you specifically to the Haberer v. Radio Shack case, a summary judgment case in which the South Dakota Supreme Court said that for ostensible authority, there must be substantial evidence indicating that the purported, or the third party, commenced or continued his relationship with the agent based on reliance that the agent had the authority with the principal. In other words, our court has said that there must be damages based on reliance that you believe they have the authority to make the deal. Here, the undisputed evidence is that by November of 2015, the deal's made. Most of the work's done. December, November 26, 2016, the most important exhibit in this case, Lowell Lundstrom believes he's not going to get paid. It's an oral agreement. He sits down and writes an email that memorializes all of the terms of what he understands his deal is. That email is Exhibit 49. It's the deal email. It's all over the record. Everybody testified about it. Here's what Lowell Lundstrom writes, a year after the deal was made, Dan, I haven't been paid the 10K for months, we're about 10 months behind. I understand that all that happened with Michael about our deal, but the one you and I made didn't involve him. My understanding is there's just one time limit here, right? Yeah. So you won't get to reply to the cross appeal if you keep, you can use your time, that's your call. I understand. Exhibit 49, Exhibit 75 shows that he knew and believed that he did not believe he was working for Watts Garrett and that the authority didn't exist. That ends ostensible authority. With that, I'll reserve the remaining time. Thank you, Judge Olken. Thank you. Thank you. Judge Erickson, Judge Kovas. Counsel? May it please the Court. My name is Mike Bornitz and I'm here today on behalf of the plaintiff and cross appellant Lowell Lundstrom, Jr. We're first asking this Court to affirm the denial of the defendant's motion for judgment as a matter of law. The focus thus far has been on apparent agency this morning. I would respectfully suggest, and I'm just going to take a minute to talk about actual agency. Exhibit 305 was something that the jury had before them, which was an affidavit from Mr. Homolka saying that he, in negotiating with my client, was acting as Mr. Watts' agent. He says, quote, however, at the time of the negotiation, I was making a contract on behalf of Daniel M. Homolka, PA, my law firm, and on behalf of Watts Garrett, LLP. I did not enter into a contract in my personal capacity. Now, obviously, you can't just rely on what the agent says, but we don't have just what the agent says here because Mr. Watts testified at trial that Mr. Homolka was in charge of the Minnesota acquisition. And that's the, this is the kind of the case that we're talking about here because Mr. Homolka referred to this as the Minnesota acquisition. Acquisition meaning signing up farmers? Yes. And in addition to Mr. Homolka's affidavit, the contingent fee for the project is evidence of actual authority. That's Exhibit 181. And those agreements say that these two law firms are handling this case jointly, together. Paragraph 3 says, quote, the firms will assume joint responsibility for client's representation, end quote. Equally important, paragraph 4 says, quote, the firms agree to advance any and all reasonable expenses. Now, that, Mr. Lundstrom, is part of the expenses for the marketing associated with the prosecution of client's claim, end quote. The clear message is that these firms are in this together. And the reason I bring the agreements up is because the record shows, and you'll have it in Exhibit 317, which is a photo of numerous contingent fee agreements that the defendants directed to be sent to Mr. Lundstrom's home. And, of course, the actual agency is how the $10,000 number got negotiated in the first place. And to be clear, the record is undisputed that the first payments, the negotiations, all occurred with Mr. Lundstrom on the $10,000 a month before there was any kind of approved budget. So that's what Mr. Lundstrom saw. And no limits to Mr. Homolka's authority were communicated to anybody. If I may, I want to address the apparent agency issue. What's the practical significance of this? Homolka was jointly and severally liable? Well, Mr. Watts is jointly and severally liable with Mr. Homolka. Right. Yeah. They're in it together. You can collect all this from Homolka. Oh, I can collect all of it from Mr. Watts, because Mr. Watts is the principal who gave apparent authority and actual authority. Is he wasting our time or not? No, not at all. Is Homolka's judgment proof? I don't know if he is or not. He may well be. But Mr. Watts was the money man here. Well, he's local, all right. Go ahead. He's the one who spearheaded this operation, okay? When President Truman said the buck stops here, Mr. Watts is the place where the buck stops. You know, does it matter that Lundstrom made statements that he understood that his deal was with Homolka? Does it matter that he didn't say that he had any specific deal with Michael Watts? Does it matter that there are no apparent representations that are actually made by Watts-Guerra to Mr. Lundstrom? I mean, there's no evidence that they said, yeah, this is our guy. And that all of these promises are broken in a period in 2014, 2015, when there is evidence in the record that you could point to and somebody could say, well, whatever is going on at this point, Homolka's gone beyond whatever authority he ever may have had. I mean, doesn't all that matter to some degree, at least on the question of denying the motion for judgment as a matter of law? No, it doesn't matter, Judge Erickson, and here's why. You're talking about a layperson on the one hand, and on the other hand of this situation, two of the most experienced mass tort attorneys in the country. These are the two who decide, we're not going to have a contract outlining the scope of Mr. Homolka's authority. And the district court found that, of course, compelling, because the district court said that would have avoided all of this. If it was true that Mr. Homolka had no agency authority or only limited agency authority, a written contract by these two sophisticated law firms would have done this. They can obviously blame Mr. Lundstrom for saying something. He's saying this as a layperson, not with the insight into the law that we perhaps all have. And the reason that this is important is because the jury instruction, and we can talk about the case law, but the jury instruction that the jury got on apparent agency says, quote, when the principal, by conduct or lack of ordinary care, causes a third party to believe another who is not actually appointed is serving as the agent for the principal. So it's that conduct that we're talking about, the choice to have a nonwritten arrangement, okay, that Mr. Watts acquiesced in that. He acquiesced in the choice to have a nonwritten arrangement. Mr. Watts was copied on the e-mails from L.J. Lundstrom discussing his, quote, verbal agreements, end quote. That's Exhibit 107. He knew that there were these verbal agreements, and he didn't do anything to look into that further. So somebody had mentioned silence or acquiescence by the principal. That's what we have here. The jury also may well not have believed everything that Mr. Watts had to say. For example, the defendants were impeached because there was in their contingent fee agreement, which is Exhibit 181, a false non-solicitation provision, which hurt their credibility. They purported in their contingent fee agreement to these 55,000-plus clients that they had not been solicited. Well, that's exactly what happened. That's what Mr. Lundstrom was hired to do. He was hired to put radio advertisements together, to send out direct mail pieces, to produce an infomercial, to get people to come to these meetings where contingent fee agreements were signed. So that hurt his credibility, you know, and the jury might have found it's a little too authority on Mr. Homolka's part when Mr. Watts gets two-thirds of all of the contingent fee and Mr. Homolka gets one-third. And guess what? Mr. Homolka, you're stuck with the bad deal that you negotiated on behalf of us, which he referred to often as Team Corn. They're in it together. That was Exhibit 333. The project was LostCornIncome.com. And Judge Erickson, to kind of come back to the question you had, when Mr. Lundstrom was asked, who were you working for, he said, I was working for the project. And he specifically worked at the specific behest of Mr. Watts at times and Mr. Homolka. That's shown in Exhibits 325, Exhibit 328, and 329, all of which went to the jury. Mr. Lundstrom exchanged emails directly with Mr. Watts and Mr. Homolka. So to say that L.J. Lundstrom really didn't get any direction or had no contact at all with Mr. Watts is a bit disingenuous. Exhibits 107 and 141 are some of those emails. They met multiple times. Mr. Watts and L.J. Lundstrom met in South Dakota at a client sign-up meeting. They met in Minnesota at an early client sign-up meeting. There were interactions together. Moving to the second issue, we're asking this Court to reverse Judge Kornman's denial of our motion for a new trial. And I would respectfully suggest that, number one, the damages were inadequate in this case, and that, number two, the jury's verdict was the result of a compromise. And I'd like to start with the compromise part. The law is not very complicated here. We had, undisputedly, a close question. You're content with a new trial on all issues? I think that depends on the... Yes or no? Yes. Yes. Okay. On damages. A new trial on... Hold on. Well... Well, come on. I knew what I meant. Your Honor, it depends on the reason that the Court reverses. I know, but that's not answering my question. But it's a... You're content with a new trial on all issues? Just yes or no? I... We are. Well, that's not necessarily going to be the answer. Right. Yes. If you answer no, that changes things. We obviously are, Judge Loken, but the reason I... It's not obvious. But here's the point of... Your first answer. Yeah. It should be damages only. Yeah. Well, and if this Court finds that the damages were inadequate, then I think the law is clear that it's a new trial on damages only. If this Court determines that... That's a legal issue. Yes. Yes. My question was... In any event, we had, in addition to a close question of liability, an odd pattern of deliberations, which is... I don't think I need to go into that in any specific detail, because it's in the brief. The jury deliberated Thursday afternoon, and that continued into Friday. On Friday, they send a note asking for exhibits related to liability. We go through the exhibits, try to find what they're looking for. You know, that's an argument... That argument just... That's not an appellate argument. I mean, we're not... Well, except Judge Erickson has been in these trenches. Yeah. But for the most part, we're not there. We aren't observing the jury and its interactions with the court and everything else. This Noel, two hours after they were saying we might be in... You know, then they decide. Good for them. Well, these are the factors the Court has to consider. Well, we don't have to consider that. Let's just take a look at what happened here, because I think that you're making sort of something that doesn't seem to be quite so mountainous to me, because here's what you've got. You've got... The jury comes back with a couple of questions. We want to know what the exhibits are. And you get some exhibits, and you send it back saying, no, no, no, no, we're looking for a different exhibit. And you do some more digging, and while you're still digging and they're still hanging around and a couple hours have gone by, they say, yeah, we've reached a verdict. And it's not really evidence of a compromise. It just is not. Because what the number they were looking for is $175,125 in an email. And after sitting there for two hours while you guys were spinning your wheels, and I've been the head wheel spinner before on answering jury questions, so I know how this goes, is that the jury just says, who cares? The question is, it's $175,000 and change, and they say, $175,000 it is, we've got a verdict, Judge. That's not a compromise. That's like, well, we were looking for the specific exhibit that gave us a specific number. But there's no rule that says they've got to get to that exact number, right? And if there's a problem with that exact number, the problem is $125,000. And if you want to say the judgment ought to be conformed to the admission made by your client, which is $175,000, $125,000, well, I get that. And that's just additive based on undisputed evidence in the record, right? But to say this is a compromise verdict, this isn't like where somebody says, I got $4,000,000, somebody else says, I got $110,000, and we decided to go with $2,055,000. I mean, that's, you know, and so you don't have evidence of compromise here. Well, I suggest that we do have evidence of compromise, as we discussed in the brief. The other thing that I think is more pertinent to your question is Exhibit 53 and 54 go together. Okay? Exhibit 53 was the email from May of 2017, where Mr. Lundstrom is attaching the invoice for what he's owed. All right? You're saying, as a matter of law, the jury would have to look at the two together and read them the way you do? I think that 53 informs what 54 is. Well, you think that. Yeah. I do. But we, we, we are, you know, you know the standard review for reversing a jury verdict. I do, Judge Loken. What is compelling that the jury had to see it your way? Well, so the, the exhibit, Exhibit 54, which says at the time, first of all, it says specifically, Mr. Lundstrom says, I'm supposed to be paid through settlement. And this is May of 2017. The case hasn't settled. You know, frankly, I was delighted to see that email, because it told me exactly what the, what the jury did. But the, but the, but the, if not, if not presumptively, at least certainly arguably. But the point is that he's saying at the time, in May of 2017, that he is owed that amount of money. The defense claimed from the opening statement to the closing argument, and the evidence in between, that he was already paid through September of 15. That he was paid up. So if that's correct, then he's owed nothing. And if he's incorrect, okay, then. Your time's up. All right. Thank you for your time. Thank you, Your Honors. I'm going to briefly address the cross-appeal issues, and I know I don't have much time, but frankly, I don't think they warrant a lot of time. Fundamentally, the legal test is an abuse of discretion whether the verdict entered by the jury was supported on the evidence, looking at it from that perspective. And for the sufficiency argument. Exhibit 54 is the beginning and the end of the inquiry. There is evidence to support it. And the case was not an A or B issue on damages. There was testimony from witnesses in the record indicating L.J. would be paid $10,000 through when he stopped working. By May of 17, he's done. That supports the verdict. There's no basis other than sheer speculation for us to invade the provenance of that jury. As to the compromise, this court has said in the Bablissett case, compromise inherently requires a, it's a factor analysis, but unless you have a substantially insufficient verdict, there's no evidence of a compromise. You can't get there. So fundamentally, when you look at this, this isn't a compromise. The verdict should be sustained, and there should be no new trial. Now back to the renewed motion for judgment as a matter of law. Here's the evidence. The evidence is this, actual authority. The agent and principal must believe. The agent must believe he has the ability. Dan Homolka and Michael Watts both unequivocally testified. The only authority he had to make a deal was approved budgets. And then you get to ostensible. The third party must detrimentally rely upon the existence of the agency. It's a stopper. When Lundstrom says, I don't have a deal with Watts, that proves he is not relying on it. That is the end of it. And as a result, we would request that this Court reverse the denial of the renewed motion for judgment as a matter of law for Watts-Guerra. We would also request that you affirm the denial of the motion for new trial. I have no further comments, and I thank you, unless you have any questions. Very good. Thank you, counsel.